## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MURIELLE ABDALLAH, Individually and on Behalf of All Other Persons Similarly Situated,<br>    Plaintiff,<br><br>v.<br><br>BAIN CAPITAL, LLC,<br>    Defendant. | Civil Action No.<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Murielle Abdallah, individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against Defendant, alleges the following based upon her personal knowledge as to herself and her own acts, and information and belief as to all matters, based upon, *inter* alia, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendant's public documents, information readily obtained on the Internet, press releases, papers from a previous litigation in France, and third-parties affidavits. Plaintiff has substantial evidentiary support for the allegations set forth herein.

## NATURE OF THE ACTION

1.  This is a federal class action on behalf of a class all consisting of persons who were employees of a Factory located in Hénin-Beaumont, France, whose employment was terminated as a result of the Defendant's tortious acts.

## JURISDICTION AND VENUE

2.  This Court has jurisdiction over this class action pursuant to 28 U.S.C. §1332 in that:

    (a)  Plaintiff, Murielle Abdallah, is a citizen of France.

    (b)  Defendant, Bain Capital, is a corporation incorporated under laws of the State of Delaware and has its principal executive offices at 111 Huntington Avenue, Boston, Massachusetts 02199.

(c)     At least one member of the class of Plaintiffs is a citizen of a State different from the Defendant within the meaning of 28 U.S.C. §1332(d)(2)(A).

(d)     The claims asserted by the Plaintiff class, aggregated as required by 28 U.S.C. §1332(d)(6), exceed the sum of $5,000,000 within the meaning of 28 U.S.C. §1332(d)(2).

(e)     The class of unnamed Plaintiffs exceeds 100 in number within the meaning of 28 U.S.C. §1332(d)(5)(B).

(f)     The Defendant is not a State, a State official, or any other governmental entity within the meaning of 28 U.S.C. §1332(d)(5)(A).

3.     Venue is proper in this District pursuant to 28 U.S.C §1391(a)(1) as Defendant's principal executive offices are located within this District.

4.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendant, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail and interstate telephone communications.

## PARTIES

5.     Plaintiff was an employee of Samsonite and worked in a factory located in the north of France in Hénin-Beaumont (the "Hénin-Beaumont Factory" or the "Factory"). Plaintiff has been damaged consequent of Bain's interference with her employment relationship with Samsonite.   As a result of Bain's wrongful interference with her employment relationship, Plaintiff's and the other members of the class' employment were terminated.

6.     Defendant, at all relevant times herein, was the principal shareholder of Samsonite with the now apparent ability to influence and manipulate the actions and decisions of Samsonite.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

7.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of former employees of a factory located in Hénin-Beaumont, France, which was owned an operated by Samsonite and whose employments were terminated as a result of Defendant tortious acts (the "Class").

8.     The members of the Class are so numerous that joinder of all members is impracticable.

9.      Plaintiff alleges that this class of persons consists of 186 persons.

10.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendant's wrongful acts.

11.     Plaintiff Murielle Addallah will fairly and adequately protect the interests of the members of the Class and has retained competent and experienced counsel.

12.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendant tortuously interfered with Plaintiff's employment relationship with Samsonite by wrongfully designing and then compelling Samsonite and it's executives to engage in a fraudulent shell game that was illegal under French law to close the Hénin-Beaumont Factory thus wrongfully interfering with and severing the employment relationship of Plaintiff and the class members with Samsonite.  The shell game involved the payment to a shell entity (HB Group)  to take control of the Hénin-Beaumont Factory in order to facilitate the illegal stripping of Samsonite of certain assets, which included the Hénin-Beaumont Factory, in order to terminate the employment relationship of the Plaintiff and the class members from Samsonite and to deprive them of the right to a redundancy plan to facilitate their securing of a new employment;

(b)     whether wrongful conduct of Defendant constituted fraud by intentionally misleading and concealing from Plaintiff the real purpose of the transfer of the Hénin-Beaumont Factory to HB Group and to deprived her of the right to a redundancy plan to facilitate her securing of a new employment. This deception continued through the trial in France during which Bain knowingly and intentionally misrepresented that it had no involvement in the decision to transfer the Hénin-Beaumont Factory and the subsequent shut down of the Hénin-Beaumont Factory;

(c)     whether the wrongful conduct of Defendant constituted negligent misrepresentation with respect to it's involvement in the transfer of the Hénin-Beaumont Factory to HB Group for the purposes of shutting the doors of the Hénin-Beaumont Factory and wrongfully interfering with Plaintiff's and the class member's employment relationship with Samsonite and to deprived them of the right to a redundancy plan to facilitate their securing of a new employment;

(d)     whether the wrongful conduct of Defendant constituted unjust enrichment by designing the fraudulent sale of the Factory for the sole purpose of reselling Samsonite at a higher price so as to make a higher profit; and

(e)     whether Defendant acts of concealment, particularly the false and misleading statement to the French court tolled the statute of limitations and/or postponed the running of the statute of limitations for wrongful interference with contract, fraud and negligence misrepresentation.

13.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. There will be no difficulty in the management of this action as a class action.

14.     Plaintiff contends that the claims set out below are proper for certification as a class action under provisions of Rule 23(b)(3).

## STATEMENT OF FACTS

**The Hénin-Beaumont Factory (France) And Plaintiff's Employment Agreement With Samsonite**

15.     Plaintiff was an employee of a luggage factory, located in Hénin-Beaumont, France, operated by Samsonite. Plaintiff had an employment agreement with Samsonite.

16.     From inception in 1984 until the fall of 2005, the Hénin-Beaumont Factory had been owned and operated by Samsonite, employing over two hundred (200) workers.

17.     The Factory manufactured injection molded plastic suitcases exclusively for the various Samsonite brands.

**Bain Capital LLC Becomes Samsonite's Main Shareholder and decides to shutdown the Hénin-Beaumont Factory**

18.     In 2003, Bain Capital LLC (hereafter "Bain") was the main and active participant of an investors' pool, also consisting of Ares Management and Ontario Teacher Pension Funds. The pool purchased approximately eighty-five percent (85%) of Samsonite's outstanding shares, through a recapitalization agreement for a total price of a hundred and six million dollars ($106,000,000). The market price of one share was, then, one cent ($0.01).

19.     As recently discovered, (*infra* §74), Bain decided to fraudulently externalize the shut down of the Hénin-Beaumont Factory as early as December 2003, in order to avoid having its newly acquired company, Samsonite closing down the Factory itself for a hundred million dollars ($100,000,000).

**Basis For The Cost of Shutting Down The Hénin-Beaumont Factory Had Bain Not Committed Fraud**

20.     The provisions of the French Labor Code requires any individual or entity employing a minimum of fifty (50) workers and seeking to terminate the employment of a minimum of ten (10) workers to implement a collective redundancy plan.

21.     The aim of such plan is to mitigate the consequences to the workers of the economical difficulties faced by the employer, and promotes reassignment of the workers to different positions within the company, or failing that, retraining.

22.     To that end, a collective redundancy plan must contain a number of financial provisions designed to assist the workers facing termination, including but not limited to training seminars and conferences, financial and logistical aid to move to a different location to be reallocated to a new position, and psychological support to help the workers during the transition period.

23.     For companies that are subsidiaries of larger corporate groups, the scope of the employer's duty of reassignment encompasses the entire group. Therefore, the employer has an obligation, to a reasonable extent, to reallocate the dismissed workers to different positions within the group, or train them to maximize their chances of external hire.

24.     For an American group similar to Samsonite in size and results, the costs of a collective redundancy plan to dismiss some two hundred (200) employees of a French subsidiary would be in the region of seventy-five to a hundred twenty million dollars ($75,000,000 – $120,000,000). Such figure would need to be provided, and entered on the consolidated accounting books of the company as a liability.

**Bain's Concealed Intervention In The Fraudulent Sale Of The Hénin-Beaumont Factory**

25.     As the Plaintiff recently discovered (*infra* §64-74), in order to avoid having to write down such liability on the books of Samsonite, Bain decided, as early as December 2003, that Samsonite should externalize fraudulently the shut down of the Hénin-Beaumont Factory rather than proceeding to the shut down itself.

26.     The fraudulent scheme consisted in paying a third party to purchase the Hénin-Beaumont Factory and operate the Factory thereafter in such a way that it would result in the bankruptcy of the Factory. But for the fraudulent scheme, Samsonite would have had to register a loss of approximately a hundred million dollars ($100,000,000) and Bain would not have been able to resale Samsonite at a billion and seven hundred million dollars ($1,700,000,000).

27.     As recently discovered by Plaintiff (*infra* §64-74), Bain therefore organized the fraudulent sale of the Hénin-Beaumont Factory. Bain scheduled meetings in December 2003, January 2004 and February 2004, to which Bain, Samsonite and a restructuring company named PR Consulting (recruited by Bain) attended. Eventually Bain organized meetings with the purchaser of the Factory in 2005.

28.     As recently discovered by Plaintiff (*infra* §64-68), during the negotiations meetings that took place in 2005, Bain plaid an active role in setting up the fraudulent scheme and had Samsonite enter into a fraudulent transaction with purchasers.

29.     Bain's master role in designing the fraudulent scheme during these meetings, as well as the very existence of these meetings, were concealed from Plaintiff by Bain and Samsonite.

**The Fraudulent Sale of the Hénin-Beaumont Factory**

30.     In 2005, despite skyrocketing profits, Samsonite, as the mouth piece for Bain, presented the representatives of the Factory's employees with a takeover plan promoted by HB Group, a shell company owned and operated by Jean-Jacques Aurel ("Aurel"), a self-proclaimed entrepreneur from Luxembourg. Aurel was brought to Samsonite by Bain who knew that Aurel would agree to be paid to purchase the Factory and lead it to bankruptcy.

31.     Indeed, Aurel had experience in implementing this kind of plan to circumvent French law and deny employees proper compensation, as he had already performed a similar takeover plan for a Delsey, Samsonite's main competitor, using a different shell company. The fraudulent operation in the Delsey case resulted in the liquidation of the Factory, and the dismissal of over two hundred (200) employees (for which Delsey has since been found liable).

32.     As decided with Bain, Aurel and Samsonite presented to the employees' representatives, the takeover plan that outlined a quick and profitable conversion of the Factory towards the production of solar panels and unbranded luggage.

33.     As it was later decided by French courts (*infra* §49-59), the takeover plan was not supported by genuine intentions and was in fact a fraud to circumvent French law.

**Bain Concealed The Fraudulent Sale Through Samsonite's Misrepresentations To The Employees**

34.     As mandated by the provisions of the French Labor Code, a company seeking to transfer an entity under its control must consult the employees' representatives on the planned transfer.

35.   Concerned by the takeover plan, and despite the attractive perspectives of a new activity, the employees' representatives hired a Certified Public Accountant firm to conduct an audit.

36.   The accountant report voiced caution about the viability of the conversion perspectives presented by the acquirers. In its report, the accounting firm specifically alerted the employees of the crucial need to obtain additional information, as the plan was extremely opaque and lacked proper supporting documentation. The acquirers (recruited by Bain) and Samsonite justified this lack of documentation by a purported necessity to maintain absolute confidentiality.

37.   It was not until May 2011, that the Plaintiff obtained before the Court of Appeal of Douai a one-page document provided by Samsonite and presented as the so confidential business plan underlying the takeover. The previous reluctance and refusal of Samsonite to produce such documentation and the circumstances in which it was finally made available to Plaintiff, cause Plaintiff to now believe that this business plan was designed by Bain.

38.   Relying on the misrepresentations of the acquirers and Samsonite that (i) the confidential business plan was real and that (ii) all jobs were going to be maintained after the acquisition, the employees' representatives did not attempt to oppose to the sale.

39.   Eventually, on June 26 2005, the Henin-Beaumont Factory was carved out of Samsonite's assets into a new company ("NewCo"). NewCo was subsequently sold to HB Group, through a complex series of transactions, some dated July 29, 2005 and others dated August 31, 2005 (the "Transactions") for a peppercorn consideration of one Euro (€1).

**The Liquidation of the Factory**

40.   Within one month following the sale, NewCo lost two hundred thousand Euros (€ 200.000). One year after the sale, NewCo filed for bankruptcy. Eventually, in a decision dated February 15, 2007 the Tribunal de Commerce of Paris, ordered the judicial liquidation of the Factory. Not one solar panel had been produced by the Factory.

41.   Plaintiff was eventually made redundant due to the liquidation of the Factory and was deprived of a termination package as well as of a proper collective redundancy plan that would have facilitated her securing of new employment. But for the furtherance of the fraudulent scheme designed by Bain, Plaintiff would have been able to enforce her contractual right to a severance pay and to a collective redundancy plan against Samsonite.

**Bain Resells Samsonite For A Significant Profit**

42.  Meanwhile, one year after the sale of NewCo to HB Group, in 2006 Samsonite generated over seventy-three million dollars ($73,000,000) net profits. This caused the stock price to jump.  Such profits would not have been generated if Samsonite had had to bear the costs of liquidation of the Factory and termination of its workers, which would have been in the range of seventy-five million to a hundred twenty million dollars ($75,000,000 - $120,000,000) (*supra* §27).

43.  In the summer of 2007, Bain and the other shareholders sold Samsonite to CVC Capital Partners, for around one billion seven hundred million dollars ($1,700,000,000), including the assumption of debt. The market price of a share was at that point one dollar and forty-nine cent ($1.49).

44.  Bain and its affiliates have therefore realized a profit of about one billion six hundred million dollars ($1,600,000,000).

 **Bain's Continuous Concealment Before French Courts**

45.  Plaintiff and her co-workers were left without a job and without a remedy and filed two complaints in France in 2007, regarding the shut down of the Henin-Beaumont Factory.

46.  In an abundance of caution, Plaintiff filed against Samsonite, as well as its shareholders. Under French law, Plaintiff could not perform discovery, nor depositions, as these procedural tools are not available in France.

47.  During these trials, not only did Bain use French procedural rules to conceal its decisive intervention in the setting up of the scheme, but as Plaintiff recently discovered (*infra* §64-68), Bain also lied before French courts by declaring for instance that it was "a stranger to the contracts and to all the acts that pertained to the litigation" (Bain's submissions before the Fist Instance Tribunal of Béthune, dated December 27,2007).

48.  However, Plaintiff recently learned <u>on July 25, 2011</u> the active role of Bain in the design and execution of the fraudulent scheme. Only then did Plaintiff have a cause of action against Bain.

**Identifying the Fraudulent Scheme Before the Civil Court**

49.  On December 14, 2007, Plaintiff together with the other members of the Class filed a claim before the First Instance Tribunal of Béthune (who had territorial jurisdiction) against Samsonite, NewCo, HB Group, Bain and the other shareholders of Samsonite asking for the cancellation of any and all legal acts that had been perpetrated to shut down the Henin-Beaumont Factory, including the Transactions. During trial, the following facts were established.

50.   To carry out the takeover, Samsonite first created a wholly-owned subsidiary, in to which the Factory was transferred together with all of the Factory's business activities and assets, including the employees. NewCo was then sold to HB Group for one Euro (€ 1).

51.   As part of the transfer, Samsonite undertook to provide the Factory with financial aid in the amount of nine million two hundred twenty-eight thousand nine hundred ninety-four Euros (€9, 228,994), as follows:

(a)   A grant of four million Euros (€4,000,000);

(b)   A loan of four million two hundred twenty-eight thousand nine hundred ninety-four Euros (€4,228,994);

(c)   A shareholder advance of one million Euros (€1,000,000).

52.   As described below, most of this financial aid was in fact paid to HB Group in consideration for its fraudulent services, which consisted in sheltering Samsonite from the cost of a collective redundancy plan it would otherwise have to assume.

53.   The advance mentioned in (c) above was a golden handshake paid to HB Group, for entering into the fraudulent scheme.

54.   The receivable constituted by the loan mentioned in (b) above was transferred by Samsonite to HB Group for one Euro (€1), and enabled the HB Group to demand from NewCo nine hundred twenty thousand Euros (€920,000) immediately after the acquisition.

55.   The careful reading of the terms of this series of agreements revealed the total absence of a commercially viable plan relating to the transfer of the Factory's activities, but also the fraudulent intent of the parties to the agreement.

56.   The economics of the scheme uncovered by the First Instance Tribunal of Béthune can be summarized as follows:

(a)   Samsonite injected around seven million Euros (€7,000,000) into the transfer;

(b)   HB Group received approximately two million Euros (€2,000,000);

(c)   The remaining five million Euros (€5,000,000) were allocated to the Factory, but one million five hundred thousand Euros (€1,500,000) were embezzled for the benefit of two entities, belonging to the acquirers namely FES and ESF under very blurred circumstances; another one

million eight hundred thousand Euros (€1,800,000) were blocked for a first demand guaranty payable to Samsonite.

57.   Therefore, the sum ultimately available to the Factory was only about two million Euros (€2,000,000).

58.   To lend a veil of commerciality, Samsonite, under Bain control, concluded a manufacturing agreement for unbranded luggage with the Factory. The conditions of sale of the unbranded production imposed by Samsonite were coercively unviable:

   (a)   the Factory was not allowed to sell the unbranded luggage via traditional lines of distribution (i.e., department stores and traditional retailers); and

   (b)   the Factory was not allowed to sell the unbranded luggage in Germany, Belgium, Spain and France until December 31, 2005 ; and in Canada and the United States until August 2009.

59.   Unsurprisingly, when rendering its decision on June 24, 2008, the First Instance Tribunal of Béthune found for the Plaintiff and cancelled the Transactions. At trial, Bain was misleading and completely concealed its entire role and decision making in the setting up of the scheme and lied to the French judge by declaring for instance that it was "a stranger to the contracts and to all the acts that pertained to the litigation". As a result, Bain was declared exterior to the annulment procedure by the Court. By lying to the French judge, and denying any involvement in the scheme before the First Instance Tribunal of Béthune, Bain concealed to Plaintiff that it was the master of the scheme.

**Applying the Civil Court Findings Before the Labor Court**

60.   On April 12, 2007, the workers filed a lawsuit against Samsonite, HB Group, NewCo, Bain and the other shareholders of Samsonite on the grounds of illegal termination of employment as a consequence of the violation of mandatory labor law provisions governing collective dismissal.

61.   Taking into account the First Instance Tribunal findings on the civil claim, the Conseil des Prud'hommes of Lens (Labor Court that had jurisdiction), in a decision dated November 14, 2008, found that Samsonite had never stopped to be the actual employer of the workers.

62.   At trial Bain falsely alleged that it was not involved in the fraudulent scheme, completely concealed its entire role and decision making in the setting up of the scheme that had lead to the illegal termination of the employees, and in a deceptive and convincing manner argued that the Labor Court had no jurisdiction over it.

63.   The Labor Court eventually annulled the termination of the Plaintiff's employment agreements but found that it had no jurisdiction over Bain.  However, by falsely alleging that it was not involved in the scheme before the Conseil des Prud'hommes of Lens, Bain concealed to Plaintiff that it was the master of the scheme.

**New Evidence Eventually Came To Light In July 2011 Revealing That Bain Had Actively Participated In The Fraudulent Scheme**

64.   On July 25, 2011 Aurel who had been sentenced to 3-year imprisonments by the Criminal Court, for his participation in the fraudulent scheme, and whose appeal was pending, revealed to Plaintiff the role Bain had plaid it the design and execution of the scheme.

65.   In an affidavit delivered to Plaintiff, Aurel indicated that Bain attended to every important meeting between Samsonite and Aurel to negotiate the takeover. The representative of Bain was Patrick Lebreton a high-ranking executive of Bain, who was specifically mandated to attend these meetings. Aurel revealed that over the course of these meetings, Samsonite's representative (with whom Lebreton was well acquainted) repeatedly sought Lebreton's assent to the main points of the scheme.

66.   These meetings were held in Paris in the offices of Maître Boucly, Aurel's legal counsel, previously Samsonite's counsel. According to information subsequently gathered at trial before the Court of Appeal (*infra* §77), these meetings occurred between the end of 2004 and July 2005.

67.   It is only upon receiving this confession in the form of an affidavit that Plaintiff learned that Bain <u>not only interfered</u> in the decision making of Samsonite but <u>dictated</u> Samsonite's actions when negotiating with HB Group.

68.   Prior to use Aurel's affidavit Plaintiff sought permission of French courts to use it in a foreign proceedings. On September 16, 2011, the First Instance Tribunal of Paris considered that the French blocking statute would not prevent Plaintiff to use the evidence in a foreign court.

69.   Plaintiff therefore brought a claim before the District Court of Massachusetts on November 1, 2011.

**Additional Facts Regarding The 2011 Evidence**

70.   On July 24, 2012 the District Court of Massachusetts granted Defendant a motion to dismiss <u>without prejudice</u> on the ground that Plaintiff had not succeed in showing that the statute of limitations should be tolled. Justice Tauro added that: "*If additional facts regarding the information that came to light in September 2011*

*would justify invoking any of the doctrines discussed above, Abdallah may refile a complaint that includes specifics regarding the doctrine she wishes to invoke.*"

71.    The evidence that came to light in September 2011 was Aurel's affidavit dated July 25, 2011 and allowed by French Courts to be used before US Courts on September 16, 2011.

72.    Aurel's affidavit evidenced that Bain lied during the proceedings before the First Instance Tribunal of Béthune and before the Labor Court of Lens. In addition, Aurel's affidavit shed a new light on information that was obtained by Plaintiff in two minutes of police interrogations, pending the appeal of the Criminal Court decision in October 2010.

73.    Indeed, before the First Instance Tribunal and the Labor Court, Bain always falsely alleged that it had been a stranger to the contracts and to all the acts that pertained to the fraud.

74.    Besides, the leading role of Bain revealed by Aurel's affidavit enlightened Plaintiff on the role Bain plaid during a meeting held on April 15, 2005 which took place at the Hilton Hotel of Brussels, between HB Group, Samsonite's managers and a representative of Bain and reported to the police in the minutes of the interrogation of Olivier Walter (a member of Aurel's team).

75.    Similarly, the fraudulent intent of Bain revealed by Aurel's affidavit explained why Marc Valentiny, an officer of Bain's group, had recruited Maxime Ronsain (the owner of PR Consulting) in 2003, in order to find the purchaser of the Hénin-Beaumont Factory, as indicated in the minutes of Ronsain's interrogation.

**Corroborating Evidence Came To Light On Appeal Before French Courts**

76.    While the District Court of Massachusetts was considering Plaintiff's first complaint and Defendant's motion to dismiss, the Paris Court of Appeal heard the appeal of Aurel and Goulletquer against the decision of the Criminal Court.

77.    At trial before the Paris Court of Appeal, Goulletquer who was a member of Aurel's team in the negotiations of the takeover, indicated that during the negotiations of the conditions of sale of Samsonite to HB Group, calls where made by Lebreton to Bain's offices in New York to seek Bain's assent on the major points of the contracts constituting the fraudulent scheme. Goulletquer testimony was given in court before the judges of the Court of Appeal and corroborated Aurel's affidavit.

78.    On July 6, 2012 the Court of Appeal confirmed the Criminal Court ruling against Aurel, Goulletquer and certain managers of NewCo. As Defendant was not a party to the appeal, the Court of Appeal did not rule against nor in favor of it.

**TOLLING THE STATUTE OF LIMITATIONS**
**The Statute Of Limitations Is Tolled For Fraudulent Concealment**

79.    The statute of limitations applicable to the Plaintiff's cause of actions was tolled until July 25, 2011 because as Plaintiff has herein alleged, Bain fraudulently concealed to Plaintiff its cause of actions.

80.    Plaintiff and the members of the Class did not discover, and could not discover through the exercise of reasonable diligence, the existence of Defendant's unlawful conduct, alleged above, until July 25, 2011 when Aurel testified regarding the details of Bain's involvement in the scheme.

81.    During the proceedings before the First Instance Tribunal of Béthune and the Labor Court of Lens, Bain always falsely alleged that it had been a stranger to the contracts and to all the acts that pertained to the fraud and made it impossible for Plaintiff to discover that Bain was in fact the master of the scheme, but for Aurel's affidavit.

82.    Aurel's affidavit dated 25 July, 2011 brought to light for the first time that Bain specifically mandated Lebreton, the high-ranking executive of Bain, to attend to every important meeting between Samsonite and Aurel, during which the scheme was formulated and furthered.  The fraudulent nature of these meetings and Bain's direct involvement were not known and could not have been discovered as these meetings were not publicly disclosed.  Over the course of these meetings, Samsonite's representative repeatedly sought Lebreton's assent to the main points of the scheme.

83.    Because Defendant's unlawful and fraudulent scheme with HB Group were not made public until July 25, 2011, before that time Plaintiff and members of the Class were unaware of Defendants' wrongdoing.

84.    The affirmative acts of Defendant Bain, including the unlawful conduct, were wrongfully concealed and carried out in a manner that precluded detection. Among other things:

(a)    They concealed the true nature of the sale transactions involving Samsonite;

(b)    Bain concealed it's involvement in devising and approving the Scheme;

(c)    Bain, along with HB, refused to disclose details of the new business plan on the grounds of confidentiality;

85.    Plaintiff and the members of the Class could not have discovered by the exercise of reasonable diligence the fraudulent scheme at an earlier date because of the

deceptive practices and techniques of secrecy that Defendant and others used to avoid detection of, and fraudulently to conceal, their unlawful conduct.

86.     Because Defendants affirmatively concealed their unlawful conduct, Plaintiffs and members of the Class had no knowledge of any facts or information that would have caused a reasonably diligent person to investigate further, and despite suing Bain and otherwise diligently pursuing Bain, did not possess enough information to hold them accountable until sometime after the criminal proceedings.

87.     As a result of Defendant's fraudulent concealment, the running of any statute of limitations has been tolled with respect to all claims that Plaintiff and the members of the Class have alleged in this complaint.

88.     Since the concealed elements listed above came to light on July 25, 2011, the statute of limitations for all Plaintiff's claims were tolled on July 25, 2011.

**Alternatively The Doctrine Of Equitable Tolling Applies To The Plaintiff**

89.     The Statute of limitations applicable to the Plaintiff's cause of action is tolled because Plaintiff has herein alleged sufficient facts for the equitable doctrine to be applied.

90.     Indeed, by her confrontation with Bain before the First Instance Tribunal of Béthune and the Labor Court of Lens, Plaintiff has exercised all reasonable diligence it could to discover information that would allow her to sue Defendant.

91.     Given that in the French judicial system, discovery and depositions are not available to parties, Plaintiff could not have uncovered Bain's role of master of the fraudulent scheme without the confession of Aurel provided by way of affidavit dated July 25, 2011.

92.     But for the affidavit of Aurel, Plaintiff fell short of having a valid cause of action against Bain alleged herein.

93.     Therefore the statute of limitations for all Plaintiff's claims were tolled until July 25, 2011.

## CAUSES OF ACTION

## COUNT I
### Tortious Interference With The Employment Agreements

94.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

95.   Plaintiff on behalf of herself and the other member of the class brings a common law claim for tortuous interference with Plaintiff's and other member of the Class' employment agreements.

96.   Until termination of her employment agreement, Plaintiff had a business relationship of economic benefit with Samsonite through her employment agreement.

97.   At all relevant times, Bain was the controlling shareholder of Samsonite as alleged herein. By virtue of its position, stock ownership, participation in and/or awareness of Samsonite's operations, Bain had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Samsonite, including the elaboration of a scheme intended to terminate Plaintiff's employment in blatant violation of the mandatory provisions of the French Labor Code.

98.   As set forth above, Bain had knowledge of the existing business relationship of economic benefit between Plaintiff and Samsonite.

99.   As set forth in this complaint, Bain organized the meetings between Samsonite and the purchasers who later acquired the Factory through the means of a fraudulent scheme, for which the purchasers were criminally convicted. Bain also appointed Samsonite's new strategy, which ultimately led to the termination of Plaintiff's employment as a result of the fraudulent transfer of the Factory. As set forth above, Bain participated in the negotiations of the sale of the Hénin-Beaumont Factory, and decided of the setting up of the scheme.

100.   As set forth above, Bain controlled the process that culminated in the fraudulent transfer of the Factory, causing Plaintiff's employment to be terminated. The violation of French law has been adjudicated and the criminal punishments have been addressed.

101.   By virtue of these actions, Bain unlawfully induced Samsonite to terminate the contract, thereby intentionally and improperly interfering with Plaintiffs employment agreement with Samsonite.

102.   As alleged in this complaint, Bain's sole motive in so interfering was to circumvent Samsonite's legal obligation to implement a collective redundancy plan, as mandated by the French Labor Code. Obviating this legal obligation

saved a significant amount of money for Samsonite. By realizing such a tremendous saving, Samsonite was able to post significant profits subsequent to the transfer of the Factory, instead of entering a provision in their consolidated accounting books. Had such provision been entered in the books to reflect the necessary costs of a legally compliant collective redundancy plan, Samsonite would not have posted a profit. Such profit posted by Samsonite enabled Bain to resell its controlling stake in Samsonite for a significant gain of over one billion dollars. In no event would Samsonite have been able to post any profits had they complied with their legal obligations. Absent profits for Samsonite, Bain would not have resold its controlling stake in Samsonite for such tremendous premium.

103. As a direct and proximate result of Bain's tortious acts, Plaintiff suffered damages as a consequence of the termination of her employment with Samsonite, and was deprived of all the benefits and financial value inherent to a collective redundancy plan.

## COUNT II
## Fraud

104. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

105. Plaintiff on behalf of herself and the other member of the Class brings a common law claim for fraud.

106. Bain caused Samsonite to misrepresent to the Plaintiff and the member of the Class that (i) the takeover was supported by a genuine and real business plan and (ii) that the employees' jobs would be maintained after the takeover. Bain had knowledge of the falsity of these misrepresentations, when elaborating the scheme to circumvent mandatory French law provisions protecting employees of illegal termination. These representations were made when Samsonite and HB Group presented the takeover plan. They were also contained in all the documents surrounding the transfer of the Henin-Beaumont Factory to the sham HB Group. In particular, all the prospective changes that were supposed to maintain the activity of the Factory were false, and Bain was well aware of the falsity of such information.

107. Plaintiff relied upon these representations as true, and acted upon them to her damage. When the employees' representatives were asked their opinion on the contemplated project of transfer, they genuinely believed in the project promoted by the "Bain-sponsored" HB Group, which raised misplaced and incorrect expectations among the employees. Therefore, the employee's representatives were not able to oppose the project. Plaintiff's reliance upon these misrepresentations caused her significant damage, as her employment was ultimately terminated, without an adequate and legally compliant collective redundancy plan to facilitate her securing of a new employment.

108.  By directing and compelling Samsonite to make misrepresentations to Plaintiff, Bain committed fraud.

## COUNT III
## Negligent Misrepresentation

109.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

110.  Plaintiff on behalf of herself and the other member of the Class brings a common law claim for negligent misrepresentation.

111.   Bain caused Samsonite to misrepresent to the Plaintiff and the member of the Class that (i) the takeover was supported by a genuine and real business plan and (ii) that the employees' jobs would be maintained after the takeover. These misrepresentations were false statement of material fact.

112.  On the basis of such false statement of material fact, Bain obtained that Plaintiff and the member of the Class did not attempt to oppose to the sale of the Factory through their representatives.

113.  Plaintiff's and members of the Class' reliance upon these misrepresentations caused them significant damage, as their employments were ultimately terminated, without an adequate and legally compliant collective redundancy plan to facilitate their securing of a new employment.

## COUNT IV
## Unjust Enrichment And Disgorgement Of Profits

114.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

115.  Plaintiff on behalf of herself and the other member of the Class brings a common law claim for unjust enrichment.

116.  By means of the unlawful conduct set forth in this Complaint – including Bain's designing the fraudulent scheme, Bain's selecting HB Group as purchasers of the Factory, Bain's direction of Samsonite to make misrepresentations to the employees – Bain intentionally avoided that Samsonite offered a collective redundancy plan and wrote down a liability in its account. Such liability would have prevented Samsonite to show seventy three millions dollars ($73,000,000) of profit in its account in 2006.

117.    The unlawful conduct set forth in this Complaint allowed Bain to resale Samsonite and make a significant profit of about one billion six hundred million dollars ($1,600,000,000).

118.    As a result of the fraudulent scheme designed by Bain, Plaintiff and the members of the Class lost the opportunity to benefit from a collective redundancy plan as well as the severance pay they were entitled to.

119.    The economic benefit derived by Bain through the fraudulent scheme is a direct and proximate result of Bain's unlawful and fraudulent acts.

120.    It is inequitable for Bain to retain the proceeds they received, based on the successful implementation of the fraudulent scheme Bain designed as alleged in this Complaint.

121.    Plaintiff and members of the Class have no adequate remedy at law for Bain's unjust enrichment.

122.    Plaintiff and members of the Class seek an order mandating restitution and disgorgement of monies Bain has unjustly obtained and the restoration of such ill-gotten monies to Plaintiff and the members of the Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff s counsel as Lead Counsel;

(b) Awarding compensatory and punitive damages in favor of Plaintiff and the other Class members against the Defendant, for all damages sustained as a result of Bain's wrongdoings, in an amount to be assessed at trial but believed to be in excess of fifteen million dollars ($15,000,000,00) including interest thereon

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R Civ. P. 38(b), Plaintiff hereby demands a trial by jury of all the claims asserted in this Complaint so triable.

**DATED: October 30, 2012**                    **Respectfully Submitted,**
                                               **PLAINTIFF,**
                                               **By His Attorneys,**


_____

Philippe Jean Joseph Pradal
Pradal & Associates PLLC.
112 West 34th, 18th Floor
New York, NY 10120
Telephone: (212) 502-6773


/s/ Timothy K. Cutler
Timothy K. Cutler (BBO# 636124)
CUTLER P.C.
10 Milk Street, Suite 720
Boston, Massachusetts 02108
(617) 338-8243 Telephone
(617) 695-2778 Facsimile
info@cutlerlegal.com